IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| CRICKET BOYD, individually and as successor trustee of THE WILLIAM BOYD FAMILY TRUST individually and on behalf of those similarly situated | ) ) ) ) ) | |
| Plaintiff, | ) ) ) | Case No. 2:17-cv-210 |
| v. | ) ) | |
| FIRST BAPTIST CHURCH OF HAMMOND, INC., | ) ) ) | JURY TRIAL DEMANDED |
| Defendant. | ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff, CRICKET BOYD, individually and as SUCCESSOR TRUSTEE OF THE WILLIAM BOYD FAMILY TRUST brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf all others similarly situated, and allege the following:

### I. INTRODUCTION

1. "And He went into the temple, and began to cast out them that sold therein, and them that bought; Saying unto them, It is written, My house is the house of prayer: but ye have made it a den of thieves." Luke 18:45-46

2. First Baptist Church of Hammond, Inc. ("First Baptist" or the "Church") materially assisted and otherwise participated in a fraudulent investment scheme orchestrated by convicted swindler Thomas Kimmel ("Kimmel"), a Deacon, paid by the Church to instruct members on how to "invest" their money. First Baptist knowingly or recklessly assisted Kimmel's fraudulent scheme by requiring members of the Church to participate in programming with the charlatan on Defendant's property.

1

## II. THE PARTIES

3. Plaintiff, Cricket Boyd, is the Successor Trustee of the William Boyd Family Trust and is a former member of Defendant First Baptist and a citizen of Indiana.

4. First Baptist, formerly known as First Baptist Church of Hammond, an Indiana non-profit domestic corporation is located at 507 State Street, Hammond, Indiana.

## III. JURISDICTION AND VENUE

5. Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).

6. Aggregate claims of individual Class Members exceed $5,000,000, exclusive of interest and costs.

7. At least one Class Member is a citizen of another state. 28 U.S.C. § 1332(d)(1)(D).

8. First Baptist is located within blocks of the Illinois state line with at least half of Class Members residing in Illinois. 28 U.S.C. § 1332(d)(4)(B).

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).

10. Defendant is deemed to reside in this district pursuant to 28 U.S.C. § 1391(c), so personal jurisdiction is appropriate.

## IV. CLASS ALLEGATIONS

11. Plaintiff brings this action pursuant to Fed. R. Civ. P. 23 on behalf of herself and all others similarly situated, comprising a class consisting of "*all persons in the United States who are current or former members of the First Baptist Church who invested with Kimmel in the Sur Line Ponzi Scheme*" (the "Class")".

12. Plaintiff is a member of the Class.

13. Excluded from the Class are judicial personnel involved in considering the claims herein, all persons and entities with claims for personal injury, the defendants, any entities in which the defendants have a controlling interest, and all of their legal representatives, heirs and successors.

14. It is estimated that the Class consists of more than one hundred persons throughout the continental United States. The members of the Class are so numerous that joinder of all members, whether otherwise required or permitted, is impracticable. The exact number of Class members is presently unknown to Plaintiff, but can easily be ascertained from Defendant's records.

15. There are numerous questions of law or fact common to the members of the Class which predominate over any questions affecting only individual members and which make class certification appropriate in this case, including:

> a. Whether Defendant, acting individually or collectively with its agents, failed to properly supervise Deacon Thomas Kimmel ("Kimmel").
>
> b. Whether Defendant, acting individually or collectively with its agents, negligently retained Kimmel.
>
> c. Whether Defendant, acting individually or collectively with its agents, negligently provided financial advice to Plaintiff.

16. The claims asserted by the named Plaintiff are typical of the claims of the members of the Class.

17. This class action satisfies the criteria set forth in Fed. R. Civ. P. 23(a) and 23(b)(3) in that Plaintiff is a member of the Class; Plaintiff will fairly and adequately protect the interests of the members of the Class; Plaintiff's interests are coincident with and not antagonistic to those

of the Class; Plaintiff has retained attorneys experienced in class and complex litigation; and Plaintiff has, through their counsel, access to adequate financial resources to assure that the interests of the Class are adequately protected.

18. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

  a. It is economically impractical for most members of the Class to prosecute separate, individual actions;

  b. After the liability of Defendant has been adjudicated, the individual and aggregate claims of all members of the class can be determined readily by the Court; and

  c. Litigation of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members that would substantially impair or impede the ability of other Class members to protect their interests.

19. Class certification is also appropriate because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate declaratory and/or injunctive relief with respect to the claims of Plaintiff and the Class members.

**V. FACTS COMMON TO ALL COUNTS**

20. Jack Schaap ("Schaap") was employed as the President and Pastor of First Baptist with authority to hire and fire Kimmel and regularly conducted church services attended by Plaintiff and Class Members.[1]

---

[1] Schaap is now serving time in Federal Prison for transporting a minor across state lines to engage in sexual contact.

21. By January 2006, Schaap hired Kimmel to act as an employee of First Baptist Church for the purposes of providing financial advice, debt counseling, budgeting, and investment advice to members of First Baptist.

22. First Baptist authorized Kimmel to work from an office on First Baptist property with his name on the door.

23. Schaap preached from the pulpit that Kimmel was the church's financial advisor with offices on church premises and that all church members should see him for financial advice.

24. Schaap preached from the pulpit that some of the money invested with Kimmel would help First Baptist.

25. Plaintiff and Class Members reasonably believed that Kimmel was an agent of the church based on Schaap's representations, Kimmel's office location, and Kimmel's title.

26. Mr. Kimmel was, in fact, employed by Defendant and held out by Defendant and its agent, Pastor Schaap, as a financial advisor providing financial advisory services to members of First Baptist Church.

27. In or around February 2006, Kimmel began telling Plaintiff and Class Members about an investment in a collateralized note program related to Sure Line Acceptance Corporation, (the "Sure Line Investments") at church functions, in meetings with church members arranged by Schaap, and during church-sponsored classes conducted at First Baptist.

28. In or about November 2007, Schaap and Kimmel were advised by counsel for First Baptist, David Gibbs ("Gibbs"), that they should not be offering the Sure Line Investments to parishioners because it could violate Indiana law and the church members were largely unsophisticated investors.

29. On or about November 7, 2007 attorney Gibbs wrote a letter to Mr. Kimmel advising him and Schaap that selling the Sure Line Investments could expose First Baptist and Kimmel to liability for selling unlicensed securities.

30. Despite the sage advice from counsel, First Baptist refused to terminate Kimmel and instead continued to materially assist in the fraud and take kickbacks on the money he stole from Church members.

31. Class Members regularly attended church services conducted by Schaap where he encouraged parishioners from the pulpit to attend finance classes taught by Kimmel, set appointments with Kimmel for financial "advice", and "invesmentt" through Mr. Kimmel.

32. Kimmel would use the Bible to teach the class the importance of being wise with money and would talk about the Sure Line Investments.

33. During the Bible-based class conducted at the church Kimmel would set individual appointments with church members on church property to take their money in the name of Sure Line Investments.

34. Kimmel targeted widows with life insurance proceeds for his scam.

35. In soliciting Plaintiff and Class Members to invest in Sure Line, Kimmel made the following representations (hereafter, the "Solicitation"):

    a. Investing with Sure Line was the best option to protect her money and money for her children;

    b. That Sure Line was a company located in North Carolina that operated a car lot under the name of Automocion, and that Sure Line made loans and financed cars in the sub-prime market;

c. That the corporate officers and managers of Sure Line were all Christian and were of like beliefs;

d. That Kimmel had his own money invested in Sure Line;

e. That the First Baptist and Schaap had invested in Sure Line;

f. That the Sure Line Investment was endorsed by Schaap;

g. That Plaintiff and class members would earn 12% interest per year on the money invested;

h. That Plaintiff Kimmel would not receive any commission or payment from Ms. Baldwin's investment in Sure Line; and

i. That Sure Line was a Collateralized Note Program and Sure Line had the inventory to pay all the investors back all of their invested money.

36. But for Kimmel's employment with the Church and the Church's express endorsement Plaintiff and Class Members would not have trusted him with their money.

37. Based on Kimmel's Solicitation and the Church's recommendation, Plaintiff and Class Members invested greater than $5,000,000 in Sur Line.

38. Kimmel promised Plaintiff and Class Members that all the money invested would be safe and that Sure Line had plenty of inventory to act as collateral so that all investors could be paid if Sure Line ever ran into any problems.

39. On or about August 6, 2006, Cricket Boyd as Trustee of the William Boyd Family Trust invested $175,000 in Sure Line Acceptance Corporation.

40. Boyd's funds came from her husband's settlement proceeds resulting from a work injury that left him permanently disabled.

41. On or about January 2, 2012, Sure Line sent correspondence to Plaintiff and Class Members informing them that Sure Line was unable to make interest payments that month.

42. On or about January 3, 2012, Boyd learned that her entire $175,000 investment was lost.

43. Sure Line's inability to pay was due to a financial collapse precipitated by years of undisclosed and misrepresented financial problems and, more importantly, the theft of investor funds for use in a Ponzi Scheme orchestrated by Kimmel.

44. Kimmel was aware that Sure Line did not have the 2-to-1 collateral represented to investors and that the company was, in fact, losing money and in danger of going under. Kimmel did not disclose this information to Plaintiff or Class Members.

45. Kimmel knew that the money that he was obtaining from Plaintiff and Class Members he solicited and sold Sure Line Investments to was actually being used to make interest payments to prior investors. Mr. Kimmel did not disclose this information to Plaintiff.

46. In order to hide the true state of the financial condition of Sure Line from 2006 to 2011, new money from new investors was used to repay past investors' principal and interest and pay undisclosed commissions and kickbacks to Schaap and Kimmel. These payments created the appearance that the investments were legitimate and generating revenue while creating a cycle where more and more investor money was needed to pay off the increasing interest payments. In short, investor funds were not being invested as represented, but were instead being used to pay off other duped victims of the scheme and conceal the scheme.

47. Ultimately, the scheme fell apart in January 2012 when there was not enough new investor money coming in to perpetuate the scheme and continue the illusion of legitimacy and profit.

48. Kimmel was indicted for conspiracy to commit wire fraud and mail fraud arising from the Sure Line Ponzi Scheme.

49. In June 2014 Plaintiff and Class Members first learned through testimony in Kimmel's criminal trial that:

    a. Schaap was receiving a 1% kick back for each of their Sure Line Investments and the investments of other investors from First Baptist Church;

    b. Kimmel was making a 10% commission on their Sure Line Investments and the investments of other First Baptist Church parishioners;

    c. 25% of the funds they invested were taken off the top to pay commissions as soon as the Class Members tendered checks to Kimmel for their Sure Line Investments.

    d. The representations concerning the collateral supporting the Sure Line Investments were false and that Sure Line did not have the collateral to support repayment of the Sure Line Investments;

    e. Kimmel had previously been served with a cease and desist order from the Alabama department of securities informing that the sale of the Sure Line Investments was the unlawful sale of unregistered securities;

    f. The Sure Line Investments were actually a Ponzi Scheme in which the funds from new investors were used to make payments to other investors as phony "interest payments" to disguise the fact that the investment was illegitimate and conceal and perpetuate the fraudulent scheme;

    g. An attorney for First Baptist had informed Schaap and Kimmel as early as 2007 that the Sure Line Investments were likely in contravention of Indiana law;

  h. That the managers and officers of Sure Line were not Christians of like belief to Plaintiff;

  i. Kimmel did not actually have any personal investments in Sure Line; and,

  j. First Baptist did not invest in Sure Line

50. Plaintiff and Class Members could not discover the true nature of the scheme and the harm they had suffered until it was revealed in testimony under oath at Kimmel's trial in June of 2014 because Schaap and Kimmel, while acting in their capacity as officers, agents, or apparent agents of Defendant, concealed the facts listed in Paragraph 47 through deception.

51. Defendant, through its principal and agents Schaap and Kimmel, prevented Plaintiff from obtaining the knowledge necessary to pursue a claim against Defendant.

## AGENCY ALLEGATIONS

52. First Baptist retained Kimmel as its agent to provide financial and investment education advice to members as a part of Church programs.

53. The Church held out Kimmel as its agent and teacher.

54. Kimmel conducted his seminars, client (victim) meetings, and classes at the Church.

55. The Church had the right to control the content of Kimmel's seminars.

56. Officers and directors of the Church participated in Kimmel's seminars.

57. The Church told its members to invest their money with Kimmel.

58. Kimmel was paid by the Church to conduct his financial seminars.

59. Kimmel shared the proceeds of his seminars with the Officers and Directors of the Church.

60. First Baptist ratified Kimmel's acts and omissions by taking kickbacks from the money he stole from Plaintiff and Class Members.

61. Kimmel was a Deacon in the Church.

62. Schaap and other Church leaders used their moral authority over the members to funnel victims to Kimmel.

63. Using the power, authority and trust of its position as spiritual advisor and authority figure to Plaintiff and Class Members, the Church enticed, induced, directed, and coerced Plaintiff to engage in financial abuse and exploitation by Kimmel.

## VI. <u>CLAIMS</u>

### <u>COUNT I</u>
### <u>NEGLIGENCE- *RESPONDEAT SUPERIOR*</u>

64. Plaintiff incorporates and realleges paragraphs 1 through 63 as though fully stated herein.

65. At all relevant times hereto Kimmel was the agent or apparent agent of First Baptist and acting within the scope of his authority.

66. Defendant had a duty, by its agents, apparent agents, and employees, to exercise toward Plaintiff and Class Members, due and proper care and financial advice in and about the services rendered them so as not to financially harm Plaintiff and Class Members.

67. Kimmel owed Plaintiff and Class Members a duty of reasonable care as a financial advisor not to convert assets entrusted to him.

68. Defendant, through its agent or apparent agent, Kimmel, was negligent in its provision of financial guidance to the Plaintiff and Class members in one or more of the following respects:

    a. Operating a Ponzi Scheme;

      b.   Converting invested funds for his own use;

      c.   Soliciting investments in unregistered funds;

      d.   Engaging in illegal investment advisory arrangements; and

      e.   Otherwise careless and negligent with Plaintiff and Class Members' funds.

69. The actual, direct, and proximate cause of Plaintiff and Class Members losses was Defendant's breach of the basic duties owed to Plaintiff.

70. Plaintiff and Class Members lost 100% of their investment with Kimmel totaling in excess of $5,000,000 as a direct and proximate result of the negligence acts and omissions described above.

## COUNT II
## NEGLIGENCE-DIRECT

71. Plaintiff incorporates and realleges paragraphs 1 through 63 as though fully stated herein.

72. First Baptist, by and through its agents, servants and employees, knew or reasonably should have known of Kimmel's exploitive propensities and/or that Kimmel was an unfit agent.

73. First Baptist had duty of ordinary care to investigate and then not retain Kimmel as a financial advisor for the Church given his well-documented history of financial crimes detailed above.

74. First Baptist negligently retained and/or failed to supervise Kimmel in the position of trust and authority as a Deacon and financial advisor where he was able to commit the wrongful acts against the Plaintiff and Class Members.

75. Defendant failed to provide reasonable supervision of Kimmel, failed to use reasonable care in investigating Kimmel and failed to provide adequate warning to Plaintiff regarding Kimmel's dangerous propensities and unfitness.

76. First Baptist actually knew of the illegality of Kimmel's scheme in 2007 and would have learned the regulatory action against Kimmel had it conducted a reasonable background check or due diligence.

77. It is foreseeable that allowing a financial predator such as Kimmel to deliver financial seminars would result in the harms and losses described above.

78. As a direct and proximate result of the negligent hiring and failure to supervise, Plaintiff and Class Members suffered substantial losses of funds invested with Kimmel.

WHEREFORE, Plaintiff, individually and on behalf of the Class as defined herein, respectfully request that this Court enter a judgment against FIRST BAPTIST COMMUNITY CHURCH and in favor of Plaintiff and the Class, and grant the following relief:

A. Determine that this action may be maintained and certified as a class action on a nationwide, statewide, and/or multistate basis under Rule 23(b)(1), 23(b)(2) and/or 23(b)(3); or alternatively, certify all questions, issues and claims that are appropriately certified under 23(c)(4); and that it designate and appoint Plaintiff as Class Representatives, and appoint Class Counsel under Rule 23(g).

B. Award Plaintiff and Class Members their actual, compensatory and/or statutory damages, according to proof;

C. Award Plaintiff and Class Members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest;

D. Award Plaintiff and Class Members such other, further and different relief as the case may require; or as determined to be just, equitable, and proper by this Court.

Dated: May 8, 2017

By: */s/Alexander N. Loftus*_____
      Attorney for Plaintiff

Alexander N. Loftus, Esq.
*Pro Hac Vice Application Pending*
STOLTMANN LAW OFFICES, P.C.
10 S. LaSalle Street, Suite 3500
Chicago, Illinois 60603
PH: (312) 332-4200
alex@stoltlaw.com